

COPY

FILED

2008 DEC -8 PM 3:59

CLERK U.S. DISTRICT COURT
CENTRAL DISTR.Q. CALIF.
LOS ANGELES

BY

1  LATHAM & WATKINS LLP
2    G. Andrew Lundberg (SBN 108509)
    *andy.lundberg@lw.com*
3    Alexandra A. Roje (SBN 220027)
    *alex.roje@lw.com*
4  355 South Grand Avenue, Suite 1500
Los Angeles, California 90071-1560
5  Telephone: (213) 485-1234
Facsimile: (213) 891-8763
6
7  Attorneys for Plaintiff
Los Angeles Dodgers LLC
8

9  UNITED STATES DISTRICT COURT

10  FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  WESTERN DIVISION

12

13  LOS ANGELES DODGERS LLC,
a Delaware limited liability
14  company,

  CASE NO. **CV08-08082** JFW (CTx)

15       Plaintiff,

**COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, DECEIT, AND UNFAIR BUSINESS PRACTICES; DEMAND FOR JURY TRIAL**

16    v.

17  ACE AMERICAN INSURANCE
COMPANY, a Pennsylvania
18  corporation,

19       Defendant.

20

21      Plaintiff Los Angeles Dodgers LLC, for its Complaint against the above-

22  named defendant ACE American Insurance Company, alleges as follows:

23  <center>**SUMMARY**</center>

24      1.    Plaintiff Los Angeles Dodgers LLC (formerly named "LA TeamCo,"

25  and hereinafter referred to as the "Dodgers") operates the Los Angeles Dodgers, a

26  Major League Baseball team based in Los Angeles since 1958. This case arises

27  out of the Dodgers' claim for insurance benefits owing under an insurance policy

28  issued by the defendant insurance company. The policy promised to insure the

1  Dodgers against the risk of disability of one of its starting pitchers, Jason Schmidt.

2  The insurer has failed to pay a substantial portion of its obligations under the

3  policy, leaving more than $9.2 million of the Dodgers' loss unpaid.

4  **BACKGROUND**

5  2.      In order to compete successfully against other Major League Baseball

6  clubs, the Dodgers endeavor to recruit, develop and retain elite professional

7  baseball players.  As in professional sports generally, over the years, the

8  competitive marketplace for such players' services has led to multi-year, multi-

9  million-dollar contracts.  These contracts are often made on a "guaranteed" basis:

10  the contract provides that the player will be compensated for his services for the

11  duration of the contract even if he is physically disabled, as the result of a sports

12  injury or otherwise, from performing at the Major League level.

13  3.      Teams that enter into such guaranteed contracts face exposure to

14  paying tens of millions of dollars in salary to players who become unable to play

15  for months or even years or, in some cases, are permanently disabled from

16  continuing their baseball careers.  Like other Major League Baseball teams (and

17  other professional sports organizations), therefore, the Dodgers sometimes seek to

18  protect themselves from such risks by insuring their obligations under guaranteed

19  player contracts.  By transferring to an insurance company a portion of the risk of

20  having to pay a disabled player under a guaranteed contract, the club obtains the

21  assurance that the disability of a highly-paid player will be mitigated by the

22  insurer's payment of part of the club's loss.

23  4.      In late 2006, the Dodgers acquired the services of Jason Schmidt, who

24  was then widely regarded as one of the most talented and effective starting pitchers

25  in Major League Baseball.  At the time, Mr. Schmidt was a 12-year Major League

26  veteran who had spent the previous five seasons with the San Francisco Giants,

27  being named to the National League All Star team in three of those five seasons

28  including 2006.  During the 2006 season, Mr. Schmidt had tied a 102-year-old

1  Giants franchise record by striking out 16 batters in one game.  The Dodgers

2  entered into a guaranteed contract with Mr. Schmidt that provided total payments

3  of $47 million over the three-year term of the contract.

4       5.     In order to protect themselves against the risk that Mr. Schmidt might

5  become disabled from performing during the period of his contract, the Dodgers

6  purchased coverage under a policy of insurance issued by defendant ACE

7  American Insurance Company ("ACE").  The ACE policy provided generally that

8  in the event Mr. Schmidt became temporarily or permanently disabled from

9  performing his profession as a Major League Baseball pitcher, ACE would

10  reimburse the Dodgers a specified sum, ranging between $63,000 to $66,000, for

11  each day of that disability, subject to various terms and conditions, up to a stated

12  limit.

13       6.     Shortly after the start of the 2007 season, Mr. Schmidt suffered a

14  shoulder injury that resulted in his missing most of the 2007 and 2008 baseball

15  seasons.  ACE, while acknowledging that Mr. Schmidt had suffered "Total

16  Disability" insured under the Policy, contends that a "Special Condition

17  Limitation" contained in the Policy, which restricts coverage for instances of

18  "disability arising from the right shoulder as pertains to conditions, afflictions and

19  consequences of the rotator cuff" in Mr. Schmidt's right shoulder, limited the

20  number of days of disability for which the Dodgers may recover benefits.

21       7.     The Special Condition Limitation does not apply to Mr. Schmidt's

22  disability.  Notwithstanding the medical evidence -- including the opinion of

23  ACE's own retained orthopedic specialist -- confirming that fact, ACE persists in

24  invoking the Special Condition Limitation to deny the Dodgers full recovery under

25  the Policy.  The Dodgers accordingly bring this action to recover the insurance

26  proceeds ACE owes, as well as their other recoverable damages and other

27  appropriate relief.

28  / / / /

## THE PARTIES

8.     Plaintiff Los Angeles Dodgers LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California, and operates the Los Angeles Dodgers Major League Baseball franchise.

9.     The Dodgers are informed and believe, and on that basis allege, that defendant ACE is, and at all times material to this action was, a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania, and transacting the business of insurance in the State of California.

## JURISDICTION

10.     This Court has jurisdiction of the subject matter of this action under 28 U.S.C. § 1332(a), in that the matter in controversy in this action exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

11.     Venue lies in this District under 28 U.S.C. § 1391(a), in that a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

### The Policy

12.     The Dodgers refer to and incorporate by reference the allegations contained in paragraphs 1 through 11 of this Complaint as though fully set forth herein.

13.     Effective February 24, 2007, ACE issued its policy of "Employer Purchased Athlete's Individual Total Disability Policy," policy number N01031612 (the "Policy"), to the Dodgers covering Jason Schmidt.  The "Termination Date" specified in the Policy was October 15, 2009 "or the end of the team's last official 2009 Regular Season day, whichever is soonest."  The Policy thus provided the Dodgers with coverage for the 2007, 2008 and 2009 seasons.

14.    A true and complete copy of the Policy, exclusive of the application and player contract originally submitted in connection with the Dodgers' purchase of the Policy, is attached hereto as Exhibit A.

15.    ACE promised in the Policy to indemnify the Dodgers against loss resulting from Mr. Schmidt's total disability, as defined in the Policy, according to the Policy's terms and conditions.

16.    At the time the Dodgers entered into the Policy with ACE, both the Dodgers and ACE were aware that Mr. Schmidt had for some time during his career with the San Francisco Giants been suffering from a partial tear of the rotator cuff in his right (pitching) shoulder.  Major League pitchers often experience such partial rotator cuff tears but nevertheless remain competitive and effective, as Mr. Schmidt had demonstrated himself to be during the 2006 season immediately prior to joining the Dodgers.  The Dodgers therefore did not find Mr. Schmidt's preexisting rotator cuff condition to exclude him from consideration as a team member.

17.    Nor, likewise, did ACE consider Mr. Schmidt's preexisting rotator cuff condition to exclude him from consideration for insurance.  Indeed, although insurers commonly exclude injuries to specified body parts entirely from coverage, in order to secure the nearly $2.5 million premium it charged the Dodgers, ACE agreed in the Policy that it would (a) fully cover disability resulting from non-rotator-cuff injuries to Mr. Schmidt's right shoulder, and (b) even cover disability resulting from rotator-cuff injuries, albeit on a more restricted basis.

18.    Specifically, ACE issued the Policy with no limitations on coverage relating to Mr. Schmidt's right shoulder other than a "Special Condition Limitation" that affected the length of the "Elimination Period" -- in effect, the deductible -- that would apply to specified injuries only.  The Elimination Period generally applicable to instances of disability under the Policy is 90 regular season days, the first 45 of which must be consecutive.  The Special Condition Limitation

1   provided that for "disability arising from the right shoulder as pertains to

2   conditions, afflictions and consequences of the rotator cuff," a special 182-

3   consecutive-day Elimination Period would apply.

4       19.    Thus, ACE agreed to provide full coverage (i.e., the same coverage

5   generally provided for disability under the Policy) for disability arising from Mr.

6   Schmidt's right shoulder, so long as the disability did not arise from "the right

7   shoulder as pertains to conditions, afflictions and consequences of the rotator cuff."

8   <div align="center">**The Shoulder Injury and Resulting Total Disability**</div>

9       20.    Mr. Schmidt began the 2007 season as a starting pitcher on the

10   Dodgers' 25-man roster, and started three games for the team at the beginning of

11   the season.  However, on April 17, 2007 he was placed on the Disabled List,

12   retroactive to April 15, 2007, due to problems with his right shoulder.  He missed

13   the next 45 games due to the shoulder injury.

14       21.    After undergoing therapy and a minor league rehabilitation

15   assignment, Mr. Schmidt returned to the lineup on June 5, 2007 -- having thus

16   missed more than 45 consecutive regular season days for purposes of the

17   Elimination Period under the Policy.

18       22.    However, Mr. Schmidt continued to experience difficulty with his

19   right shoulder, and returned to the Disabled List on June 18, 2007, retroactive to

20   June 17, 2007.  On June 20, 2007, he underwent surgery on the shoulder.

21       23.    Mr. Schmidt remained disabled for the balance of the 2007 season.

22   Accordingly, on July 27, 2007, he satisfied the 90-day Elimination Period under

23   the Policy.

24       24.    Mr. Schmidt remained disabled during the entire 2008 season due to

25   his right shoulder.  In September 2008, he underwent further surgery on the

26   shoulder.

27   ////

28   ////

### The Dodgers' Claim for Coverage

25.     Following the satisfaction of the 90-day Elimination Period on July 27, 2007, the Dodgers on August 22, 2007 submitted the Proof of Disability Form required by ACE to process a claim for benefits under the Policy.  The Dodgers sought coverage under the ACE policy for amounts paid to Mr. Schmidt under his contract during the period beginning July 27, 2007 and thereafter for as long as benefits continued under the policy -- currently through the last day of the 2008 regular baseball season.

26.     ACE responded to the Dodgers' Proof of Disability by letter dated September 5, 2007.  ACE did not dispute that Mr. Schmidt was then "Totally Disabled," as defined in the ACE policy.  However, ACE there maintained, and has since continued to maintain, that the Special Conditional Limitation provision applied to that disability.  According to ACE, the Dodgers as a result did not become entitled to benefits on account of Mr. Schmidt's ongoing disability until June 16, 2008 -- i.e., the date on which Mr. Schmidt had been disabled for 182 consecutive days.

27.     Since July 15, 2008, ACE has made payment to the Dodgers for Mr. Schmidt's days of disability from June 15, 2008 forward.  However, ACE refuses, on the basis of the Special Condition Limitation, to make payment for any of the 143 days of disability occurring between July 27, 2007 and June 16, 2008 that are covered because the 90-day general Elimination Period, and not the 182-consecutive-day period provided by the Special Condition Limitation, applies to the disability.  As a result, the Dodgers have paid Mr. Schmidt in excess of $9.2 million in salary for those 143 missed days of service, but have received no benefits under the ACE Policy for them.

28.     ACE received payment of the full premium it charged for the Policy.

29.     The Dodgers have complied with all other terms and conditions of the Policy required on their part to be performed and whose performance is not

1    otherwise excused.

2         30.    By failing to make timely, or any, payment of the benefits due under

3    the Policy for the periods of covered disability occurring between July 27, 2007

4    and June 16, 2008, ACE has breached the contract represented by the Policy.

5         31.    As a proximate result of ACE's breach of the Policy, the Dodgers

6    have been damaged in an amount not less than $9,267,882 (representing 65 days of

7    disability during the 2007 season at $65,934 per day, plus 78 days of disability

8    during the 2008 season at $63,874 per day), plus the time value of the unpaid funds

9    from the date of ACE's breach to the present.

10                   **<u>SECOND CLAIM FOR RELIEF</u>**

11          **(Breach of the Covenant of Good Faith and Fair Dealing)**

12         32.    The Dodgers incorporate by reference the allegations contained in

13    paragraphs 1 through 31 of this Complaint as though fully set forth herein.

14         33.    ACE's continuing failure to pay benefits under the Policy is not only

15    mistaken but unreasonable, and reflects ACE's failure to give at least equal regard

16    to the interests of the Dodgers in obtaining payment of the subject insurance

17    benefits as the regard ACE gave to its own interests in avoiding payment, in breach

18    of the implied covenant of good faith and fair dealing.

19         34.    Without limitation, ACE has breached the covenant of good faith and

20    fair dealing:

21         (a)    by refusing to pay the Dodgers' claim under the Policy without a

22    reasonable basis for that refusal;

23         (b)    by failing to apply the Policy in a reasonable, evenhanded manner in

24    light of all of the evidence available, including without limitation by electing to

25    apply the Policy in a manner that transmutes a facially limited exception to

26    coverage dealing with Mr. Schmidt's right rotator cuff into a broad, all-

27    encompassing limitation triggered by any injury to Mr. Schmidt's right shoulder

28    whatsoever;

1    (c)    by conducting its claim investigation and evaluation with the purpose

2    of avoiding, rather than finding, coverage for the Dodgers' loss under the Policy.

3    Among other conduct, ACE solicited the opinion of a "peer reviewer" orthopedist

4    whom it engaged to review the records of Mr. Schmidt's condition and medical

5    treatment, but then (i) evidently failed to ask the reviewer questions designed to

6    elicit an opinion on the facts material to the Dodgers' claim for coverage, and (ii)

7    disregarded the opinion of the reviewer when such opinion in fact ultimately

8    supported the Dodgers' claim;

9    (d)    by interpreting the Policy in a manner that depends upon the

10   assignment of meaning to policy terms which, under a reading of the Policy as a

11   whole and in view of the Policy's purposes, they do not reasonably bear; and

12   (e)    by failing to respond reasonably, completely and in good faith to the

13   Dodgers' inquiries concerning ACE's coverage position, including without

14   limitation by falsely claiming an inability to provide the Dodgers with the report of

15   its "peer reviewer."

16   35.    ACE's improper object in so conducting itself was, on information

17   and belief, at all times to delay, and if possible in whole or in part avoid, payment

18   of the Dodgers' legitimate claim for insurance benefits for the period from July 27,

19   2007 to June 15, 2008.

20   36.    As a proximate result of ACE's conduct, the Dodgers have suffered

21   damage as herein alleged, and have incurred substantial additional costs, including

22   but not limited to their attorneys' fees, expenses and costs incurred in seeking to

23   mitigate and remedy ACE's breach of contract by the filing and conduct of this

24   action and otherwise, in an amount as yet to be ascertained, all to be proved at or

25   before the time of trial.

26   37.    ACE's conduct with respect to the aforementioned acts and omissions

27   was fraudulent, oppressive, and on information was undertaken with malice.  On

28   information and belief, the officers, directors, and/or managing agents of ACE,

1  directed, or were aware of and ratified, such conduct, such that the conduct of its

2  employees and agents is properly imputed to ACE itself.

3       38.    By reason of the foregoing, the Dodgers are entitled to recover, in

4  addition to their actual damages, damages for the sake of example, to punish ACE

5  for its misconduct in this matter, and to deter any such future misconduct.

6  <div align="center">**THIRD CLAIM FOR RELIEF**</div>

7  <div align="center">**(Deceit)**</div>

8       39.    The Dodgers incorporate by reference the allegations contained in

9  paragraphs 1 through 38 of this Complaint as though fully set forth herein.

10       40.    As an inducement to the Dodgers to enter into the Policy, ACE led the

11  Dodgers to believe that coverage for injuries to Mr. Schmidt's right shoulder

12  would be specially restricted only in instances in which Mr. Schmidt suffered

13  disability arising from certain specified injuries, but not all injuries, to the

14  shoulder.  ACE did so by falsely representing, in the Policy, and in its letter of

15  April 23, 2007 explaining why it had imposed the Special Condition Limitation (a

16  true and complete copy of which letter is attached as Exhibit B hereto), that

17  coverage would be restricted only with respect to "the right shoulder as pertains to

18  conditions, afflictions and consequences of the rotator cuff."

19       41.    In agreeing to purchase the Policy, the Dodgers reasonably relied

20  upon ACE's representations that coverage for injuries to Mr. Schmidt's right

21  shoulder would be restricted only in the circumstances specified, and would

22  otherwise be afforded on the terms generally applicable under the policy, including

23  the 90-day elimination period.

24       42.    On information and belief, at the time it made the foregoing

25  representations, ACE had no intention of making payment under the Policy for any

26  disability involving Mr. Schmidt's right shoulder, whether or not it involved "the

27  right shoulder as pertains to conditions, afflictions and consequences of the rotator

28  cuff," except under the coverage-reducing provisions of the Special Condition

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT FOR BREACH OF CONTRACT, ETC.

1  Limitation.  Accordingly, ACE's representations as to the extent of coverage it

2  intended to provide under the Policy were false, and ACE knew them to be false, at

3  the time they were made.

4      43.   As a proximate result of ACE's fraudulent conduct, the Dodgers have

5  suffered damage as alleged hereinabove.

6      44.   On information and belief, the officers, directors, and/or managing

7  agents of ACE, directed, or were aware of and ratified, such conduct, such that the

8  conduct of its employees and agents is properly imputed to ACE itself.

9      45.   By reason of the foregoing, the Dodgers are entitled to recover, in

10  addition to their actual damages, damages for the sake of example, to punish ACE

11  for its misconduct in this matter, and to deter any such future misconduct.

12                    **FOURTH CLAIM FOR RELIEF**

13                     **(Unfair Business Practices)**

14      46.   The Dodgers incorporate by reference the allegations contained in

15  paragraphs 1 through 45 of this Complaint as though fully set forth herein.

16      47.   The Dodgers bring this claim for relief in their individual capacity.

17      48.   The acts and practices alleged hereinabove constitute acts of unfair

18  competition as defined by California Business and Professions Code Section 17200

19  in that they are unlawful, unfair and fraudulent, as follows:

20          (a)    It is unlawful under Section 780 of the California

21          Insurance Code for an insurer to misrepresent the terms of an

22          insurance policy or the benefits or privileges promised thereunder;

23          (b)    It is unfair to engage in the practices as heretofore

24          alleged, because they deprive policyholders of the insurance coverage

25          they intend to purchase and believe they have purchased; and

26          (c)    It is fraudulent to misrepresent the terms of an insurance

27          policy or the benefits or privileges promised thereunder.

28  / / / /

1    49.    ACE's unlawful, unfair and fraudulent practices, as described above,

2    present a continuing threat to the Dodgers and other insurance policyholders, in

3    that the risk of loss presented by such conduct is one that may go unrecognized,

4    leading the policyholder to believe that it has purchased insurance coverage which

5    ACE in fact does not intend to and will not provide.

6    **PRAYER FOR RELIEF**

7    Wherefore, the Dodgers pray for judgment as follows:

8    **On their First Claim for Relief:**

9    1.    For compensatory damages in the amount of $9,267,882, being the

10   insurance benefits owing but remaining unpaid under the Policy for the period

11   from July 27, 2007 to June 15, 2008;

12   **On their Second Claim for Relief:**

13   2.    For compensatory damages in the amount of their costs, fees and

14   expenses incurred as a result of their efforts to reduce or avoid their damages as a

15   result of defendant's conduct, including without limitation all amounts expended in

16   pursuit of this action, as proven at or before trial;

17   3.    For exemplary and punitive damages, to punish defendant and to deter

18   future misconduct by defendant and persons who are similarly situated;

19   **On their Third Claim for Relief:**

20   4.    For compensatory damages in the amount of the insurance benefits

21   owing but remaining unpaid under the Policy for the period from July 27, 2007 to

22   June 15, 2008;

23   5.    For exemplary and punitive damages, to punish defendant and to deter

24   future misconduct by defendant and persons who are similarly situated;

25   **On their Fourth Claim for Relief:**

26   6.    Pursuant to California Business and Professions Code Section 17203,

27   and under the equitable powers of the Court, for an order permanently enjoining

28   ACE from committing, aiding, abetting or inducing the commission of the unfair

1 business practices alleged herein, and specifically, from marketing, selling or

2 enforcing policies including provisions substantially similar to the Special

3 Condition Limitation;

4   7.   Pursuant to California Business and Professions Code Section 17203,

5 and under the equitable powers of the Court, for an order directing the restoration

6 to the Dodgers of all funds and profits acquired from them by means of any act or

7 practice described herein which is found by the Court to be unlawful, unfair or

8 fraudulent within the meaning of that statute, including without limitation the

9 premium paid for the Policy;

10   **On All of their Claims for Relief:**

11   8.   For their costs of suit incurred herein, including their reasonable

12 attorneys' fees;

13   9.   For prejudgment and postjudgment interest at the legal rate on all

14 sums awarded; and

15   10.   For such other and further legal, equitable or other relief as this Court

16 may deem just and proper.

17 Dated:  December 8, 2008           LATHAM & WATKINS LLP
18                                    G. Andrew Lundberg
                                      Alexandra A. Roje
19

20                                    By _____
21                                       G. Andrew Lundberg

22                                    Attorneys for Plaintiff
23                                    Los Angeles Dodgers LLC

COMPLAINT FOR BREACH OF CONTRACT, ETC.

1

## **DEMAND FOR JURY TRIAL**

2

3        Plaintiff demands trial by jury on all issues triable by jury.

4    Dated:  December 8, 2008              LATHAM & WATKINS LLP
                                           G. Andrew Lundberg
5                                          Alexandra A. Roje

6

7                                          By _____
                                                G. Andrew Lundberg
8

9                                          Attorneys for Plaintiff
                                           Los Angeles Dodgers LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# **PRO**FINANCIALSERVICES

*High-Limit Disability Underwriters*

## EMPLOYER PURCHASED
## ATHLETE'S INDIVIDUAL
## TOTAL DISABILITY INSURANCE
## POLICY

MANAGING GENERAL UNDERWRITER:

**PRO FINANCIAL SERVICES, INC.**
1450 EAST AMERICAN LANE, SUITE 1650
SCHAUMBURG, ILLINOIS 60173-6086
PHONE: (847) 619-6699
FAX: (847) 619-5533
TOLL FREE: (800) 832-8000

15



**ACE American Insurance Company**
1601 Chestnut Street
Philadelphia, PA 19103
800.352.4462

# Individual Disability Insurance Policy

## ACCIDENTAL BODILY INJURY OR SICKNESS OR DISEASE
## EMPLOYER PURCHASED
## ATHLETE'S INDIVIDUAL TOTAL DISABILITY INSURANCE POLICY

This is a legal contract between ACE American Insurance Company and the Owner as stated in the SCHEDULE. This Policy is made up of the Schedule, application and any attached riders or amendments. It is issued in consideration of the payment of the first required premium and is subject to a contractual obligation existing between the Owner and the Insured. The Company will pay benefits according to the terms and conditions of coverage described in the Policy.

The Policy is governed by the laws of the state in which it is delivered.

Signed for ACE AMERICAN INSURANCE COMPANY at Philadelphia, Pennsylvania

JOHN J. LUPICA, President                    GEORGE D. MULLIGAN, Secretary

## THIS POLICY IS NON-RENEWABLE AND NON-PARTICIPATING.

## PLEASE READ THE POLICY CAREFULLY.

# TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|

SECTION 1 – What This Policy Provides ........................................................... 3

SECTION 2 - Schedule ..................................................................................... 4

SECTION 3 – Effective Times ........................................................................... 8

SECTION 4 – When Coverage Begins .............................................................. 8

SECTION 5 – When Coverage Ends ................................................................. 8

SECTION 6 – Grace Period .............................................................................. 9

SECTION 7 - Definitions ................................................................................. 10

SECTION 8 - Exclusions ................................................................................. 13

SECTION 9 - Limitations ................................................................................. 14

SECTION 10 – Uniform Provisions .................................................................. 15

AH-1400                   ACE American Insurance Company              Page 2

## SECTION 1 – WHAT THIS POLICY PROVIDES

The Company will pay the Total Disability benefit as shown in the SCHEDULE for each Regular Season day missed by the Insured during the Maximum Benefit Period as shown in the SCHEDULE if:

1.  The Insured becomes Totally Disabled, as defined in the DEFINITIONS section, and as a direct result of:
    a.  an Accidental Bodily Injury that occurs while this Policy is in force; or
    b.  a Sickness or Disease that first Manifests itself while the Policy is in force; and
2.  The Insured satisfies the Elimination Period as shown in the SCHEDULE; and
3.  The Insured is under the regular care of a Physician other than him/herself or a member of his or her Immediate Family for the disability; and
4.  The Owner and Insured satisfy all the terms and conditions of the Policy.

**SECTION 2 – SCHEDULE**

The Effective Date entered below is subject to the applicable provisions of the Policy in accordance with the benefit coverage provided.

This SCHEDULE applies to a professional athlete.

| | |
|---|---|
| Policy Number: | *N01031612* |
| Name of Insured:<br>Address:<br>City, State and Zip: | *Jason Schmidt*<br>*35 View Ridge Circle*<br>*Longview, Washington 98632* |
| Name of Owner:<br>Address:<br>City, State and Zip | *L.A. Team Company*<br>*1000 Elysian Park Avenue*<br>*Los Angeles, California 90012* |
| Sport applicable: | *Baseball* |
| Occupation: | *Professional Baseball Player – Pitcher* |
| Name of Professional Team for which the Insured is contractually obligated to play: | *Los Angeles Dodgers* |
| Effective Date: | *February 24, 2007 at 12:01 a.m.* |
| Termination Date: | *October 15, 2009 at 12:01 a.m., or the end of the team's last official 2009 Regular Season day, whichever is soonest.* |
| Elimination Period: | *Ninety (90) [Forty-five (45) Consecutive] Regular Season Days* |
| Elimination Period Limitation: | *The Elimination Period is defined as the number of Regular Season days at the commencement of each period of Total Disablement during which no benefits are due or payable. The first forty-five (45) days missed of the ninety (90) day Elimination Period must be consecutive. All days missed must be caused by the same Accidental Bodily Injury or Sickness or Disease and the total number of days must be accrued within two (2) Regular Seasons of play. Furthermore, after a period of Total Disability, in the event the Insured returns to Participate in forty-five (45) Regular or Post-season days, any subsequent Total Disability shall be deemed a new injury and subject to a new Elimination Period.* |

Special Condition Limitation

A MINIMUM ONE HUNDRED EIGHTY-TWO (182) CONSECUTIVE REGULAR SEASON DAY ELIMINATION PERIOD will apply for any disability resulting from:

*The right shoulder as pertains to conditions, afflictions and consequences of the rotator cuff.*

Elimination Period for the Special Condition Limitation is defined as the number of Regular Season days at the commencement of each period of Total Disablement during which no benefits are due or payable.  The Elimination Period will not be considered satisfied and no benefits will be due or payable under this Policy for any disability resulting from the conditions and afflictions stated within this limitation, until the Insured has missed one hundred eighty-two (182) consecutive Regular Season days.

Recurrent Disability Period:                    *Forty-five (45) Regular Season Days*

**TOTAL DISABILITY BENEFITS**

| Injuries Sustained During: | Benefit Payable | Benefit Period |
|---|---|---|
| PERIOD ONE:<br>*February 24, 2007 to the end of the team's last official 2007 Regular Season day.* | $65,934.00 | *per 2007 Regular Season day(s) missed* |
| | $63,874.00 | *per 2008 Regular Season day(s) missed* |
| | $63,874.00 | *per 2009 Regular Season day(s) missed* |
| PERIOD TWO:<br>*The end of the team's last official 2007 Regular Season day to the end of the team's last official 2008 Regular Season day.* | $63,874.00 | *per 2008 Regular Season day(s) missed* |
| | $63,874.00 | *per 2009 Regular Season day(s) missed* |

20

| Injuries Sustained During: | Benefit Payable | Benefit Period |
|---|---|---|

**PERIOD THREE:**
*The end of the team's last official 2008 Regular Season day to October 15, 2009, or the end of the team's last official 2009 Regular Season day, whichever is soonest.*

$63,874.00

*per 2009 Regular Season day(s) missed*

**Maximum Amount Payable:**

*$29,315,934*
In no event will the Company's total liability for all benefits covered by the Policy exceed this Maximum Amount Payable.

**Maximum Benefit Period:**

*Four hundred fifty-six (456) Regular Season days*
The Maximum benefit Period will reduce by one day for each day of the Regular Season the Insured has been insured before the start of Total Disability.

**Benefit Payable:**

In the event the Owner/Insured's Regular Season varies from one hundred eighty-two (182) days, the total benefit of the one hundred eighty-two (182) days will be divided by the actual number of the Owner/Insured's Regular Season days.

**Rehabilitation:**

The Insured having suffered an Accidental Bodily Injury or Sickness or Disease covered under the Policy which has satisfied the Elimination Period as stated above and qualified for benefit under the Policy, the Company will pay for:
Minor League Rehabilitation: 100% of the applicable Total Disability Benefit, as stated above, for up to a maximum of fifteen (15) Regular Season days while the Insured is on rehabilitation assignment to the Team's Minor League Affiliate. After the aforesaid fifteen (15) days, 50% of the applicable Total Disability Benefit, as stated above, for up to a maximum of forty-five (45) Regular Season days while the Insured is on rehabilitation assignment to the Team's Minor League Affiliate.

**Grace Period:**

*Thirty-one (31) days*

**Premium Schedule:**

Total Premium For The Entire Term:       ***$2,489,886.00***

| Premium Due Dates | Amounts Due |
|---|---|
| *February 24, 2007* | *$1,148,903.00* |
| *October 15, 2007* | *$990,906.00* |
| *October 15, 2008* | *$350,077.00* |

Application Part I Dated:                   *March 3, 2007*
Medical Examiner's Report Part II Dated:    *February 16, 2007*

| | |
|---|---|
| Territorial Limits: | *Worldwide* |
| Name of Beneficiary:<br>Address:<br>City, State and Zip | *L.A. Team Company*<br>*1000 Elysian Park Avenue*<br>*Los Angeles, California 90012* |
| Forms Attached At Issue: | *Application Part I dated March 3, 2007*<br>*Medical Application Part II dated February 16, 2007*<br>*Insured's Professional Sports Contract* |
| Exclusions Deleted: | *None* |
| Conditions or Activities Not<br>Covered: | *As per Policy and Attachments* |
| Authorized Representative: | |
| Send Notice of Accidental Bodily<br>Injury or Sickness or Disease to:<br>Name:<br>Address:<br>City, State and Zip: | *Pro Financial Services, Inc.*<br>*1450 East American Lane, Suite 1650*<br>*Schaumburg, Illinois 60173-6086* |
| Send Notice of Claim and Proof<br>of Disability to:<br>Name:<br>Address:<br>City, State and Zip: | *Pro Financial Services, Inc.*<br>*1450 East American Lane, Suite 1650*<br>*Schaumburg, Illinois 60173-6086* |
| Administrative Office:<br>Name:<br>Address:<br>City, State and Zip: | *Pro Financial Services, Inc.*<br>*1450 East American Lane, Suite 1650*<br>*Schaumburg, Illinois 60173-6086* |
| Policy Fee (a one-time charge) | *Not Applicable* |

## PRE-EXISTING CONDITION LIMITATION

All Pre-existing Conditions declared to the Company will be covered, unless otherwise specified in the Waiver of Coverage Rider.  All medical conditions related to questions on the Application for which answers are not disclosed to the Company on the Application will not be covered.

## REGULAR SEASON LIMITATION:

For the purpose of this SCHEDULE, Regular Season days shall commence on the Owner/Insured's officially scheduled opening game and shall terminate at the end of the Owner/Insured's last officially scheduled game and shall not include the Owner/Insured's exhibition, spring-training, or post-season games.

## SECTION 3 – EFFECTIVE TIMES

The effective time for any dates used in the Policy as shown in the SCHEDULE are at the Owner's principal address last shown on the Company's records.

## SECTION 4 – WHEN COVERAGE BEGINS

Coverage will be in force upon the latest of the following dates:
1. the date the Company, or its administrative office as specified in the SCHEDULE, receives the Owner's first premium;
2. the date the Company, or its administrative office as specified in the SCHEDULE, approves in writing the Owner's signed applications and any other forms or documentation that the Company requests the Owner to sign or that the Company, or its administrative office, may require receipt of for its approval;
3. the Effective Date of coverage shown in the SCHEDULE.

The Company reserves the right to modify the terms and conditions of the Policy.

## SECTION 5 – WHEN COVERAGE ENDS

Coverage will end when any one of the following occurs:

1. the date the Insured dies;
2. the date the maximum amount payable (if applicable) as defined in the SCHEDULE, is reached;
3. the date the Owner requests in writing to end coverage;
4. the Termination Date as shown in the SCHEDULE;
5. at the end of the period for which the Owner has paid the premium, if the Owner does not pay the required premium by the end of the Grace Period;
6. the date the Insured terminates employment, unless otherwise agreed to in writing by the Company;
7. the date the insurable interest between the Owner and the Insured ceases to exist;
8. the date the professional sports contract is altered, unless otherwise agreed to in writing by the Company;
9. the date of any change in status, such as the assignment of a professional sports contract to another professional team or non-affiliate minor league team, unless otherwise agreed to in writing by the Company;
10. the date of any change in the Occupation of the Insured as defined in the SCHEDULE unless otherwise agreed to in writing by the Company;
11. the date the Insured ceases to be a member of the active roster of the professional sports team shown in the SCHEDULE unless:
    a. the Insured has been sent to a Minor League Affiliate, in which case coverage will continue until the end of the sixtieth (60th) day from the date the Insured is sent to such Minor League Affiliate, or
    b. the Insured is placed on the League approved Disabled List.

**SECTION 6 – GRACE PERIOD**

After the first installment payment is paid, the Company will allow a Grace Period as shown in the SCHEDULE for the payment of each installment payment due as shown in the SCHEDULE. During the Grace Period, the payment due must be paid in order to prevent the Policy from terminating.



## SECTION 7 – DEFINITIONS

1. "Accident or Accidental" means a single sudden and unexpected event which occurs during the Policy period at an identifiable time and place which causes unexpected Bodily Injury at the time it occurs.

2. "Bodily Injury" means physical harm sustained by the Insured which is the direct cause of an Accident occurring while this Policy is in force, independent of disease or bodily infirmity or any other cause.

3. "Complication of Pregnancy" are determined as follows:
   1) Before the pregnancy ends, these conditions are included: (a) acute nephritis; (b) nephrosis; (c) cardiac decompensation; (d) missed abortion; (e) hyperemesis gravid arum; and (f) eclampsia of pregnancy. Other pregnancy related conditions will be covered that are as medically severe as those listed.
   2) Complications will also include: (a) non-elective cesarean section; (b) ectopic pregnancy; and (c) miscarriage or abortion where a live birth is not possible.
   3) The following conditions are not considered a complication of pregnancy; (a) false labor; (b) occasional spotting; (c) rest during pregnancy, even if prescribed by a Physician; (d) morning sickness; (e) elective cesarean section; or (f) like conditions that are not medically termed as complication of pregnancy.

4. "Elimination Period" means the continuous period of time as shown in the SCHEDULE at the commencement of each period of Total Disablement for which no benefits are due or payable.

5. "Immediate Family" means a person who is related to the Insured in any of the following ways: spouse, brother-in-law, father-in-law, son-in-law, sister-in-law, mother-in-law, daughter-in-law, parent (includes stepparent), brother or sister (includes stepbrother or stepsister), or child (includes legally adopted stepchild).

6. "Insured" means the person stated as the Insured in the SCHEDULE who has been accepted for coverage by the Company and for whom the required premium was paid and for whom a valid insurable obligation must exist, between the Owner and the Insured, as evidenced by an executed contract or other documentation defining such insurable interest.

7. "League" means the organization known as Major League Baseball.

8. "Manifest" means the date when a Sickness or Disease is reasonably capable of diagnosis by a Physician.

9. "Occupation" means the Occupation of the Insured as stated in the SCHEDULE.

10. "Off-Season" means the period between the last day of the Regular Season and the first day of the following Spring Training.

11.   "Owner" means the person or entity who applied for insurance in respect of the Insured. The Owner will pay the required premium. The Owner must have a valid insurable obligation to the Insured as evidenced by an executed contract or other documentation defining such insurable interest. The Owner will be the sole beneficiary unless stated to the contrary in the SCHEDULE.

12.   "Participate" means that the Insured:
1) is on the active roster of the professional sports teams as stated in the SCHEDULE for which the Insured is contractually obligated to play; and/or
2) is dressed or available or physically able to practice or play for such team as stated in the SCHEDULE.

13.   "Physician" means a person who is:
1) licensed to practice medicine and prescribe and administer drugs or perform surgery; and
2) legally qualified as a medical practitioner operating within the scope of his or her license.

14.   "Postseason" means the contiguous period immediately following the Regular Season during which Playoff games are scheduled for teams involved in competing for the League championship.

15.   "Pre-existing Condition" means a condition for which:
1) medical advice or treatment was recommended by or received from a Physician during the two (2) year period preceding the Effective Date of this coverage of; or
2) symptoms were present during the two (2) year period preceding the Effective Date of this coverage which would cause a prudent person to seek medical attention.
A Pre-existing Condition disclosed to the Company on the application will be covered unless otherwise specified in the Waiver of Coverage Rider.

16.   "Recurrent Disability Period" means the period of time within the Recurrent Disability Period as stated in the SCHEDULE wherein the Insured suffers a recurrence of Total Disablement as a result of the same Accident Bodily Injury or Sickness or Disease, and such prior Total Disablement had satisfied the Elimination Period as stated in the SCHEDULE and qualified for benefit under this Policy, such recurrence will be deemed part of the prior disability and will not be subject to a new Elimination Period.

However, if the Insured returns to play after a period of Total Disablement which has satisfied the Elimination Period stated in the SCHEDULE and qualified for benefit under this Policy, and is then able to Participate for a number of Regular Season days equal to the number of days as stated in the Recurrent Disability Period in the SCHEDULE any Total Disablement commencing thereafter will be subject to a new Elimination Period.

17.   "Regular Season" means the first to the last day of the regular playing season of the League in which the Owner/Insured's team plays during which the scheduled games are played by all League Teams.

18.  "Sickness or Disease" means any physical illness or condition or Complication of Pregnancy which:

1)  (a) first Manifests itself while this Policy is in force; and
    (b) is not a Pre-existing Condition as defined in this Policy.

2)  Is a Pre-existing Condition, but:
    (a) is declared on the application for this Policy; and
    (b) is not excluded from coverage by name or specific description.

"Sickness or Disease" shall not include normal pregnancy under this Policy.

19.  "Spring Training" means the period between the first and last day of the League Teams official coaching held immediately prior to the beginning of the Regular Season. The first day of Spring Training shall be defined as the official "reporting date" as determined by the team.

20.  "Total Disablement, Totally Disabled or Total Disability" means the Insured's complete and total physical inability as result of the Accidental Bodily Injury or Sickness or Disease to Participate, as defined in this Policy, in his or her Occupation as stated in the SCHEDULE.

21.  "Unearned Premium" means a refund of premium for this Policy when it terminates prior to the original Termination Date. The amount of premium refund is dependent upon the length of time elapsed prior to termination and also upon the period of time that the unexpired portion of this Policy would have covered.

## SECTION 8 – EXCLUSIONS

This Policy does not cover an Accidental Bodily Injury or Sickness or Disease caused by, in whole or in part, or as a result of:

1. The death of the Insured.  No covered claim shall exist and no benefit shall be due or payable under this Policy in the event of the death of the Insured. No claim shall be assumed or payable under this Policy in the event of the disappearance of the Insured.

2. Any practices or activities that are excluded by the terms of:
    (1)  A Waiver of Coverage Rider; or
    (2)  the Insured's professional sports contract.

   However, this exclusion does not apply if the practice or activity is sanctioned, in writing, by the Company.

3. A Bodily Injury or Sickness or Disease excluded under a Waiver of Coverage Rider.

## SECTION 9 – LIMITATIONS

1. The act of the Insured, being determined by a Physician to be in such physical condition so as to be able to Participate in his or her Occupation as stated in the SCHEDULE or to Participate in team practice, shall be deemed a termination of Total Disablement.

2. No benefits shall be payable under this Policy:
   (1) In the event of any Participation, or attempted Participation, by the Insured in his or her Occupation as stated in the SCHEDULE after commencement of the Total Disablement unless such Participation is with the consent of the Owner's Team Physician.
   (2) For any Regular Season days missed by the Insured due to any strike by the players of any team playing in the League, or any lock-out by the owners of any team playing in the League, whether or not the Insured would have missed such unplayed Regular Season day(s) due to his or her Total Disablement.
   (3) Based solely on the Insured's failure to pass a team physical.
   (4) Based solely on the fact that the Insured has been placed on the League approved Disabled List.
   (5) For the Insured spending time in a drug rehabilitation or weight loss clinic and/or program.

## SECTION 10 – UNIFORM PROVISIONS

1. CONDITIONS PRECEDENT TO RECOVERY. The conditions and provisions set forth herein are conditions precedent to the obligation of the Company to pay any benefits hereunder.

2. NOTICE OF CLAIM. See Section 10 – Uniform Provisions, 3. Notice of Accidental Bodily Injury or Sickness of Disease, 4. Claim Forms, and 5. Proof of Disability provisions of this Policy.

3. NOTICE OF ACCIDENTAL BODILY INJURY OR SICKNESS OR DISEASE. Details of the nature and the extent of the Accidental Bodily Injury or Sickness or Disease which may give rise to a claim under this Policy, shall be given to the Company, through its authorized representative as shown in the SCHEDULE, on an Incident Report Form supplied by the Company, within seven (7) days after its occurrence, or as soon thereafter as is reasonably possible. This form must be properly completed and returned to the address shown on the form.

4. CLAIM FORMS. When the Company or its authorized representative, as stated in the SCHEDULE, having received the Notice of Accidental Bodily Injury or Sickness or Disease has ascertained that the Elimination Period, as stated in the SCHEDULE, has been satisfied it will send the Owner forms for filing Proof(s) of Disability. If these forms are not given to the Owner within fifteen (15) days after the end of the Elimination Period, as stated in the SCHEDULE, the Owner will meet the Proof of Disability requirement by submitting to the Company a written statement of the nature and extent of the Accidental Bodily Injury or Sickness or Disease providing all the information as is required in the Proof of Disability provision in this Policy, within the time limit stated in the Proof of Disability provision in this Policy.

5. PROOF OF DISABILITY. Written Proof(s) of Disability must be given by the Owner to the Company within thirty (30) days after the end of the Elimination Period and thereafter on a periodic basis as requested by the Company. If it is not reasonably possible for the Owner to give written proof to the Company in the time required, the Company will not reduce or deny the claim for this reason if the proof and certificate are filed as soon thereafter as is reasonably possible. The Proof(s) of Disability should be on a form supplied by the Company and shall provide the following information:

    (1) Details of the nature and extent of the Accidental Bodily Injury or Sickness or Disease; and

    (2) The date of commencement of the Insured's Total Disablement; and

    (3) The dates of all Regular Season days missed by the Insured in respect of the Total Disablement for which benefit is being claimed; and

    (4) The name and address of all treating Physician(s) and hospital (s) and an authorization allowing the Company to obtain all records the Company deems necessary to evaluate the claim. This information need only be submitted with the initial Proof of Disability unless a new Physician or hospital has treated the Insured since the previous submission; and

(5) A copy of the Physician's certification showing that the Insured was unable to Participate in his or her Occupation as stated in the SCHEDULE as a result of the Accidental Bodily Injury or Sickness or Disease during the period being claimed for under paragraph (3) above, or where appropriate, a copy of the Physician's certification showing the date when the Insured had recovered sufficiently to resume his or her Participation in his or her Occupation as stated in the SCHEDULE; and

(6) The Owner is further required to submit an updated Proof of Disability form whenever there is a change in the medical condition of the Insured.

6. CLAIMS COOPERATION. The Insured and the Owner shall provide, assist, and cooperate with the Company and its authorized representative as shown in the SCHEDULE in the investigation of the incident or claim. In no event shall the Company be liable to pay any benefits hereunder unless the Insured and the Owner cooperate with the Company and its authorized representative.

The Owner shall furnish to the Company or its authorized representative as shown in the SCHEDULE all information which the Company may reasonably require with regard to matters pertaining to this Policy. All documents, books, records, medical information and any other information which may have a bearing on this insurance, claims or premium hereunder shall be made available for inspection and audit by the Company or authorized representative as shown in the SCHEDULE at all reasonable times during the term of this Policy and within one (1) year of its final termination or until the resolution of all claims hereunder, whichever is later. Clerical error will not invalidate insurance otherwise validly in force nor continue insurance validly terminated.

7. PHYSICAL EXAMINATION. After initial notice or submission of a claim form, any Physician appointed by the Company shall be allowed, so often as may be reasonably necessary, to conduct an examination of the Insured. Any such examination shall be at the Company's expense.

8. CHANGE OF OCCUPATION. If the Insured changes his or her Occupation or duties to other than what is stated in the SCHEDULE, the Company must be notified in writing prior to such change at its administrative office as shown in the SCHEDULE. The Company will then either:

(1) increase or reduce the premium in accordance with the benefit amount and occupational risk; or

(2) end coverage.

9. ASSIGNMENT. An assignment of this Policy will not be binding until the Company has received, approved and has recorded a written instrument to that effect. The Company is not responsible for the validity and sufficiency of an assignment.

10. NON-DISCLOSURE. For the first two (2) years from the Effective Date of this Policy, any material misstatement, non-disclosure or concealment, whether or not such are innocent or fraudulent, in relation to any matter affecting this Insurance shall render this Policy voidable at the option of the Company.

31

11. FRAUDULENT CLAIMS. The making by the Insured or the Owner of any fraudulent claims shall render this Policy null and void from the Effective Date and all claims under the Policy shall be forfeited.

12. PAYMENT OF PREMIUM. In respect of all periods of insurance, the premium must be stated together with the date(s) such premium is (are) due. In the event that the premium(s) as shown in the SCHEDULE is (are) not paid within the Grace Period, then this Policy will automatically lapse as of the last day of the Grace Period. The total premium for the entire term covered under this Policy, as shown in the SCHEDULE, is under all circumstances always fully due in the event of any claim being paid hereunder.

13. TIME LIMIT ON CERTAIN DEFENSES. After two (2) years from the Effective Date of this Policy, only fraudulent misstatements made in the application may be used to void this Policy or deny any claim for Accidental Bodily Injury or Sickness or Disease commencing after the expiration of such two (2) year period. In the event of any contest, the Owner/Insured will be furnished a copy of the instrument in question.

14. ENTIRE CONTRACT; CHANGES. This Policy, including the applications, riders, endorsements and any attached papers, constitutes the entire contract between the Owner and the Company. Only an authorized officer of the Company can authorize a change or waive any provisions in this Policy. The approval must be noted on or attached to this Policy. No agent has the authority to change this Policy or to waive any of its conditions.

15. CONFORMITY WITH STATE LAW. Any provision of this Policy which, on its Effective Date, is in conflict with the laws of the state in which the Policy was issued, is amended to conform to the minimum requirements of such laws.

16. TIME OF PAYMENT OF CLAIM. All benefits payable under this Policy for any Accidental Bodily Injury or Sickness or Disease will be paid in accordance with the SCHEDULE upon receipt of due written Proof of Disability, and after the Company has completed an investigation of such incidents or claim. Benefits which accumulate for claims incurred during the Policy period will be payable within thirty (30) days of the end of the applicable benefit period as shown in the SCHEDULE.

17. PAYMENT OF CLAIMS. The Company will pay the Owner of this Policy any benefits due unless a Beneficiary other than the Owner has been properly designated to receive such proceeds.

18. REINSTATEMENT. If the Owner does not pay his or her Premium before the Grace Period ends, this Policy will lapse as of the last day of the Grace Period. However, the Owner may submit an application for reinstatement and if the application is approved, this Policy will be reinstated as of the date of the approval at premium and terms to be agreed upon. Lacking such approval, this Policy will be reinstated on the forty-fifth (45th) day after the date the application is received at the Company's administrative office, as shown in the SCHEDULE, unless the Company has previously notified the Owner, in writing, of the Company's disapproval to the reinstatement. If the Company or its administrative office, as specified in the SCHEDULE, accepts a premium from the Owner after the Policy lapses without requiring an application for reinstatement, this Policy will be reinstated as of the date the premium was accepted.

The reinstated Policy will only cover:

(1) an Accidental Bodily Injury sustained after the date of reinstatement; or

(2) a Sickness or Disease that first manifests itself more than ten (10) days after the date of reinstatement.

In all other respects, the Owner's rights and the Company's rights will remain the same. These rights are subject to any provisions noted on or attached to the reinstated Policy.

19. LEGAL ACTION. No legal action may be brought to recover on this Policy within sixty (60) days after the end of the applicable benefit period as shown in the SCHEDULE. No such action may be brought after three (3) years from the end of the applicable benefit period as shown in the SCHEDULE.

20. CHANGE OF BENEFICIARY. The Owner of this Policy may change the beneficiary at any time by sending a written notice to the Company at its administrative offices, as shown in the SCHEDULE. The Beneficiary's consent is not required for this or any other change in this Policy, unless the designated Beneficiary is the Insured. The change will take effect on the date the request is signed or on the date the Company receives it, whichever is later.

---

## CALIFORNIA LIFE AND HEALTH INSURANCE
## GUARANTY ASSOCIATION ACT
## SUMMARY DOCUMENT AND DISCLAIMER

Residents of California who purchase life and health insurance and annuities should know that the insurance companies licensed in this state to write these types of insurance are members of the California Life and Health Insurance Guaranty Association. The purpose of this Association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the Association will assess its other member insurance companies for the money to pay the claims of insured persons who live in this state and, in some cases, to keep coverage in force. The valuable extra protection provided through the Association is not unlimited, as noted in the box below, and is not a substitute for consumers' care in selecting well managed and financially stable insurers.

---

**The California Life and Health Insurance Guaranty Association may not provide coverage for this policy. If coverage is provided, it may be subject to substantial limitations or exclusions, and require continued residency in California. You should not rely on coverage by the Association in selecting an insurance company or in selecting an insurance policy.**

**Coverage is NOT provided for your insurance or any portion of it that is not guaranteed by the Insurer or for which you have assumed the risk, such as a variable contract sold by prospectus.**

**Insurance companies or their agents are required by law to give or send you this notice. However, insurance companies and their agents are prohibited by law from using the existence of the Association to induce you to purchase any kind of insurance policy.**

To contact the Department of Insurance, write or call:

**The Consumer Affairs Division**
**California Department of Insurance**
**Ronald Reagan Building**
**300 South Spring Street**
**Los Angeles, CA 90013**

Toll free number:      1-800-927-4537 (In state only, except for area codes 213, 310 and 818)
Otherwise:              1-213-897-8921

The Department of Insurance should be contacted only after discussions with the insurer have failed to produce a satisfactory resolution to the problem.

Please contact Pro Financial Services at (800-832-8000) to attempt to resolve any problems you have before contacting the Consumer Affairs Unit.

---

Below is a brief summary of this law's coverages, exclusions and limits. This summary does not cover all provisions of the law; nor does it in any way change anyone's rights or obligations under the Act or the rights or obligations of the Association.

34

## COVERAGE

Generally, individuals will be protected by the California Life and Health Insurance Guaranty Association if they live in this state and hold a life or health insurance contract, or an annuity, or if they are insured under a group insurance contract, issued by a member insurer. The beneficiaries, payees or assignees of insured persons are protected, as well, even if they live in another state.

## EXCLUSIONS FROM COVERAGE

However, persons holding such policies are not protected by this Association if:
- their insurer was not authorized to do business in this state when it issued the policy or contract;
- their policy was issued by a health care service plan (HMO), Blue Cross, Blue Shield, a charitable organization, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company, an insurance exchange, or a grants and annuities society;
- they are eligible for protection under the laws of another state. This may occur when the insolvent insurer was incorporated in another state whose Guaranty Association protects insureds who live outside that state.

The Association also does not provide coverage for:
- unallocated annuity contracts; that is, contracts which are not issued to and owned by an individual and which guarantee rights to group contract holders, not individuals;
- employer and association plans, to the extent they are self-funded or uninsured;
- synthetic guaranteed interest contracts;
- any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk, such as a variable contract sold by prospectus;
- any policy of reinsurance unless an assumption certificate was issued;
- interest rate yields that exceed an average rate; and
- any portion of a contract that provides dividends or experience rating credits.

## LIMITS ON AMOUNT OF COVERAGE

The Act limits the Association to pay benefits as follows:

### Life and Annuity Benefits
- 80% of what the life insurance company would owe under a life policy or annuity contract up to
  - $100,000 in cash surrender values;
  - $100,000 in present value of annuities; or
  - $250,000 in life insurance death benefits.
- A maximum of $250,000 for any one insured life no matter how many policies and contracts there were with the same company, even if the policies provided different types of coverages.

### Health Benefits
- A maximum of $200,000 of the contractual obligations that the health insurance company would owe were it not insolvent. The maximum may increase or decrease annually based upon changes in the health care cost component of the consumer price index.

## PREMIUM SURCHARGE

Member insurers are required to recoup assessments paid to the Association by way of a surcharge on premiums charged for health insurance policies to which the act applies.

EXHIBIT B

# **PRO**FINANCIALSERVICES

*High-Limit Disability Underwriters*

April 23, 2007                                                                                                     **2nd Day Air**

Mr. Darin Tidwell
Marsh Private Client Life Insurance Services
4695 MacArthur Court, Suite 700
Newport Beach, California 92660

Re:     **LA Team Co. in respect of Jason Schmidt**
          **ACE American Insurance Company**
          **Employer Purchased Athlete's Individual Total Disability Insurance**

Dear Darin:

Pursuant to their review of the required information, please be advised that, with effect from inception, February 24, 2007, ACE American Insurance Company has agreed that a Special Condition Limitation of a One hundred eighty-two (182) Consecutive Regular Season Day Elimination Period will be applied to the LA Team Co. in respect of Jason Schmidt's right shoulder as pertains to conditions, afflictions and consequences of the rotator cuff.

Therefore, it is understood by all parties that in addition to the standard Policy Elimination Period of Ninety (90) [Forty-five (45) Consecutive] Regular Season Days, an additional Special Condition Period of One hundred eighty-two (182) Consecutive Regular Season Days missed will apply to any disability resulting from:

  1)        the right shoulder as pertains to conditions, afflictions and consequences of the rotator cuff.

A Waiver of Coverage Rider, as stated under the Conditions section of our conditional coverage letter dated February 27, 2007 will be attached to the Policy.

Also, per our previous conversations, the premiums have been reduced by 5% due to the above Condition Limitation. Therefore, enclosed please find our revised invoice.

If you have any questions regarding this matter, please do not hesitate to contact our office.

Sincerely,
PRO FINANCIAL SERVICES, INC.

Jill A. Bartnick
Director of Underwriting

JAB/bab/SCH32exclltr

EXHIBIT B

3 b